UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

LAUFER GROUP INTERNATIONAL, LTD,

                    Plaintiff,

            -v-

STANDARD FURNITURE MFG CO, LLC, *et al.*,

                    Defendants.

19-CV-10885 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Laufer Group International Ltd. ("Laufer") filed this breach of contract action against Standard Furniture Manufacturing Co., LLC ("Standard"), International Furniture Marketing LLC ("IFM"), Todd Evans, and Dan Siggers.[1] Invoking maritime jurisdiction, Laufer alleges that Defendants are liable for over $500,000 in unpaid fees related to its shipments of Defendants' goods from Asia to the United States. Presently before the Court is Laufer's motion for summary judgment, which Defendants oppose. For the following reasons, Laufer's motion is granted in part and denied in part.

## I.    Background[2]

      Laufer is a non-vessel operating common carrier that contracts with steamship lines and acts as an intermediary to provide transportation of goods for manufacturers. (Dkt. No. 58 ¶¶ 1, 3.) As an intermediary for its clients, Laufer secures space on a vessel, arranges for the goods to

---

[1] Though the action was originally also filed against Kerry Nickerson, Ms. Nickerson's motion to dismiss for lack of personal jurisdiction was granted (*see* Dkt. No. 33 at 9) and she is no longer a defendant in this case.

[2] The following facts are undisputed unless otherwise noted.

be delivered and loaded on the vessel, and arranges for the receipt and transportation of the goods when they arrive in the United States. (Dkt. No. 58 ¶ 4.)

Standard is a manufacturer and seller of home furnishings. (Dkt. No. 58 ¶¶ 7.) Todd Evans was its CEO and President and Dan Siggers was its Chief Operating Officer during the relevant time period. (Dkt. No. 58 ¶¶ 8–9.) In May 2018, Standard and Laufer entered into a Non-Vessel Operating Common Carrier Service Arrangement (the "Arrangement") in which Standard agreed to ship a minimum quantity of six hundred units of cargo during the term of the contract — from May 1, 2018 to April 30, 2019, though there were additional deliveries past this timeframe — and was given an option to ship additional units under the same terms and conditions if Laufer was able to accommodate those shipments. (Dkt. No. 56, Ex. 4 ¶ 4; Dkt. No. 58 ¶ 14.) IFM was listed as a company eligible to book cargo pursuant to the terms and conditions of the arrangement. (Dkt. No. 56, Ex. 4 at 7.)

Laufer issued a bill of lading for each shipment it handled on behalf of Standard, and IFM was identified as the consignee on most of the shipments handled by Laufer. (Dkt. No. 58 ¶¶ 15–17.) Within five to ten days prior to the ship's docking at the United States port, Laufer issued an invoice to Standard for the cost of the shipment. (Dkt. No. 61 ¶ 33.)

Most of the containers shipped by Laufer on behalf of Standard were shipped to Macy's. (Dkt. No. 58 ¶ 24.) For shipments going to Macy's, an appointment had to be scheduled through Macy's online appointment system. (Dkt. No. 58 ¶ 52.) Macy's required appointments to be entered two to ten days prior to the delivery date. (*Id.*) Though Laufer originally was responsible for booking appointments with Macy's, Standard began making the appointments in February 2019. (Dkt. No. 61 ¶ 51.)

When shipments arrived at the United States port, Defendants were allotted a certain amount of time, free of charge, to pick up the goods and return the container.  Once this time expired, additional charges, known as "accessorial charges," were applied to containers.  (Dkt. No. 58 ¶ 33.)  The accessorial charges are assessed by steamship lines, ports, railroads, and truckers, which Laufer would pay for and then seek reimbursement from Defendants.  (Dkt. No. 58 ¶ 36.)  These charges include the following: (1) demurrage charges if the container is not picked up at the terminal within the allotted free time; (2) detention/per diem charges if the empty container is not returned to the terminal within the allotted free time; (3) yard storage, which is assessed by truckers for storing goods while waiting to deliver them or storing empty containers while waiting to return them to the terminal; and (4) chassis charges, which is also assessed by the trucking companies for the storage use of their trucks.  (Dkt. No. 58 ¶¶ 37–40.)  The Arrangement provided the types of accessorial charges that Defendants were responsible for when applicable.  (Dkt. No. 56, Ex. 4 at 14.)  Laufer sent separate bills for any accessorial charges.  (Dkt. No. 61 ¶ 36.)

In late 2018, President Trump imposed tariffs on Chinese goods and threatened to impose higher tariffs, which led to a rush to have containers docked in the United States before the tariff was implemented.  (Dkt. No. 58 ¶ 28.)  There was a high volume of vessel traffic from Asia to the United States in late 2018 and early 2019 as a result, causing significant congestion at the American ports, delays in unloading cargo, and delays in picking up and returning containers from the ports.  (Dkt. No. 58 ¶¶ 29, 31, 35.)

Laufer maintains a system, called PeerPLUS, that contains some information on the status of the containers.  (Dkt. No. 58 ¶¶ 46–50.)  According to Defendants, the information provided should normally include the: (1) container number and size; (2) port of loading; (3)

estimated date of departure and actual date of departure; (4) port of discharge; (5) the estimated and actual date of discharge; (6) the date of "out-gate" and "in-gate" (i.e., when the containers were picked up and returned); and (6) the last free day. (Dkt. No. 58, Ex. 31.) The parties dispute whether PeerPLUS provided sufficient information under the parties' agreements. (Dkt. No. 58 ¶¶ 47–51.)

The majority of disputed charges at issue here, which amount to $517,531.94 plus interest, constitute accessorial charges. (Dkt. No. 58 ¶¶ 34, 87.) However, a small portion of the disputed charges relate to freight charges. (Dkt. No. 61 ¶ 49.) The time period for the disputed charges spans from December 12, 2018, to February 10, 2020. (Dkt. No. 61 ¶ 100.)

## II.     Legal Standard

A party is entitled to summary judgment if it can "show[] that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is "material" if "it might affect the outcome of the suit under the governing law." *Hurley v. Tozzer, Ltd.*, No. 15 Civ. 2785, 2018 WL 1087946, at *1 (S.D.N.Y. Feb. 26, 2018) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002)). The party moving for summary judgment bears the burden of showing that no genuine dispute of material fact exists, *id.*, and in assessing whether the movant has carried this burden, a court "must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his or her favor," *Access 4 All, Inc. v. Trump Int'l Hotel & Tower Condo.*, 458 F. Supp. 2d 160, 166 (S.D.N.Y. 2006).

### III. Discussion

Defendants contend that there are genuine disputes of material fact that preclude summary judgment. Specifically, Defendants argue that there are two primary disputes as to liability: (1) which agreements control the parties' relationship; and (2) whether Laufer itself performed its obligations under the controlling agreements, including by providing sufficient documentation about the shipments in order for Defendants to adequately assess the validity of the third-party accessorial charges. Defendants also argue that summary judgment on damages is precluded because there is a genuine dispute of material fact as to what rate applied for shipments after the first six hundred containers were shipped and because Laufer's invoices are inconsistent. (*See* Dkt. No. 57 at 16–22.) The Court addresses each argument in turn.

#### A.   Controlling Agreements

Defendants first argue that there is a genuine dispute of material fact as to which agreements control the parties' relationship. They contend that the "extent of Laufer's obligations" are "found in multiple documents, including the [Arrangement], an annex to the [Arrangement], the [Standard Operating Procedures (SOPs),] and several amendments to the foregoing documents." (Dkt. No. 57 at 16.)

It is undisputed that the parties first entered into a relationship under the Arrangement in May 2018. (*See* Dkt. No. 56, Ex. 4.) The Arrangement provides: "Unless otherwise provided herein, all services provided by [Laufer] shall also be subject to the provisions in its governing tariff LUFR-006 and to all provisions of [Laufer's] bills of lading, as if all such terms were specifically incorporated herein. In the event of a conflict between this Contract, the governing tariffs or [Laufer's] bill of lading, the terms of this Contract shall take precedence." (Dkt. No. 56, Ex. 4 ¶ 6.) The Arrangement also states that "[t]he essential terms of this Contract shall be

5

set forth in tariff format in [Laufer's] Essential Terms Tariff LUFR-007." (Dkt. No. 56, Ex. 4 ¶ 12.)

"In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." *South Rd. Assocs., LLC v. IBM*, 4 N.Y.3d 272, 277 (2005). To determine whether an ambiguity exists in the contract, courts must look "within the four corners of the document, not to outside sources. It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Au New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411, 2019 WL 1437516, at *10 (S.D.N.Y. Mar. 31, 2019) (internal quotation marks omitted).

The Court concludes that the Arrangement is unambiguous and that the relevant documents that establish the extent of the parties' obligations to one another are the Arrangement, tariff LUFR-006, the bills of lading terms and conditions, and Laufer's essential terms tariff. Defendants attempt to get around the four corners of the Arrangement by pointing to the parties' SOPs, but nowhere in the Arrangement do the parties agree that they are bound by this document. And the SOP itself is digitally signed by only Standard and not by Laufer. (Dkt. No. 58, Ex. 9 at 1.) The Arrangement specifically provides what documents create their obligations to one another — the Arrangement itself, the bills of lading, the bills of lading tariff, and Laufer's essential terms tariff. (*See* Dkt. No. 56-4.)[3]

---

[3] Defendants also argue that though they may be bound by the bills of lading, the bills of lading pertain only to shipments from the port of origin to the port of discharge, and therefore do not cover the vast majority of disputed charges at issue here. (Dkt. No. 57 at 17–18.) The plain language of the Arrangement, however, contradicts this assertion. (*See* Dkt. No. 56-7.) Section 6 of the Arrangement provides: "[A]ll services provided by [Laufer] shall also be subject to the provisions in its governing tariff LUFR-006 and to all provisions of [Laufer's] bills of lading."

The Court therefore concludes that there is no genuine dispute of material fact regarding which documents govern the parties' contractual relationship and will only look to the Arrangement, the bills of lading terms and conditions, and Laufer's essential terms tariff when construing the parties' obligations to one another.

### B.     Laufer's Performance Under the Terms of the Agreements

Defendants next contend that Laufer failed to meet its obligations under the parties' agreements, including by failing to: deliver containers to Macy's and retrieve shipping containers within the 48-hour period as required; make or keep appointments with Macy's; comply with the notice and pre-approval requirements set forth in the SOPs; properly bill Standard for excessive accessorial charges; comply with the one "add-on" invoice requirement; and provide sufficient information about the shipments. (Dkt. No. 57 at 16–17.)

These alleged obligations do not arise from the governing documents in the parties' relationship. Rather, these are directives laid out in the parties' SOPs, if at all.[4] (*See generally* Dkt. No. 58, Ex. 10.) For instance, the SOP notes that Standard can only "accept [one] add-bill per shipment" and that all containers were to be dropped off at Macy's and picked up within 48 hours. (Dkt. No. 58, Ex. 10 at 4.) But these alleged requirements are nowhere to be found in the relevant contractual documents between the parties and are therefore not obligations that Laufer could have breached.

Furthermore, the bills of lading Terms & Conditions expressly provide that Laufer "does not undertake that the goods shall be delivered at any particular time or for any particular market

---

(Dkt. No. 56, Ex. 4 ¶ 6.)  Moreover, Defendants point to nothing in their memorandum of law or their Rule 56.1 Statement to support their contention.

[4] Though Defendants fail to cite to any provisions in the SOPs or other documents in their briefing, their Rule 56.1 Counter Statement provides support for the Court's conclusion that these alleged obligations arose from the SOPs. (Dkt. No. 58 ¶¶ 18–37.)

7

and shall not be liable for any direct or indirect losses caused by any delay." (Dkt. No. 56-11 ¶ 6.5.)  This precludes any arguments by Defendants that Laufer breached their agreement by failing to schedule appointments in a timely manner or failing to pick up and deliver containers on time, or that it should be held responsible for accessorial charges that resulted from the Trump tariff concern.  *See also Fratelli Ricatto Import & Export Co. v. S/S/ Torm Birgitte*, No. 99 Civ. 8721, 2000 WL 991654, at *2 (S.D.N.Y. July 19, 2000) ("Bills of lading containing terms that specifically exclude liability for delay in arrival of cargo are binding.")

  The Court also concludes that there is no genuine dispute of material fact as to whether the PeerPLUS system provided sufficient information to substantiate the accessorial charges.  Though Lindsay Young, Standard's corporate designee, claimed that PeerPLUS was a system that contained data manually inputted by Laufer and did not include information on "interchange documentation, or in-gate and out-gate documentation" (Dkt. No. 58, Ex. 1 ¶¶ 94–95), she also testified that she had never actually reviewed PeerPLUS (Dkt. No. 58, Ex. 3 at 86:21–87:11).  Laufer's corporate designee, Kristine Jameson, on the other hand, testified that certain information — including the "in-gate" and "out-gate" information — is electronically fed by the carrier, *i.e.*, the steamship line itself (as opposed to being manually inputted by Laufer employees once they receive information from the carriers).  (Dkt. No. 58, Ex. 2 at 93:7–22.).  Defendants' own exhibit of PeerPLUS further discredits Young's statements, as there are columns that provide for the "in-gate" and "out-gate" information.  (*See* Dkt. No. 58, Ex. 31; Dkt. No. 60 at 8–9 (Plaintiff explaining that this exhibit includes in-gate and outdate information).)

  Defendants argue that Laufer was required to provide documentation confirming when a truck driver arrives at the port or railway station, also known as "interchange documentation." (*See, e.g.*, Dkt. No. 61 ¶ 140.)  For support, Defendants point to Paragraph 9 of the Arrangement,

which states: "Shipment records maintained to support the Contract will be copies of bills of lading, data freight receipts, arrival notice/freight bills or other documents maintained by the Parties in the normal course of business which substantiate performance of the Contract. Shipper and Carrier shall cooperate in maintaining shipment records and exchange such records, documents and reports as requested by the other Party." (Dkt. No. 56, Ex. 4 ¶ 9.) Defendants contend that such documentation is kept in the normal course of business and was therefore required under the Arrangement, which Laufer denies. (Dkt. No. 61 ¶ 140). But fatal to Defendants' argument is that they do not explain how this information is any different from the "in-gate" and "out-gate" information provided in PeerPLUS. Indeed, Young suggested that these two types of information were interchangeable. (*See* Dkt. No. 58-1 ¶ 59 (explaining that the type of documentation that was needed was "interchange . . . and/or in-gate/out-gate documentation.") Furthermore, Laufer provides evidence that Defendants first asked for interchange documentation only after Laufer demanded payment for the overdue invoices. (*See* Dkt. No. 62 ¶ 23). Defendants fail to refute this, which strongly suggests that the documents were not kept in the normal course of business.

The Court therefore concludes that there is no genuine dispute of material fact as to liability.[5]

### C.  Damages

The Court first briefly addresses Defendants' contention that the invoices are so inconsistent that they are "suspect on their face." (Dkt. No. 57 at 22.) Though Defendants do not further substantiate this claim in their briefing, based on their Rule 56.1 statement, it appears

---

[5] To the extent Defendants argue that IFM or the individual defendants are not liable for the charges at issue, the Court disagrees. *See Maersk, Inc. v. Neewra, Inc.*, 687 F. Supp. 2d 300, 328 (S.D.N.Y. 2009) ("[P]rincipals to whom liability [has been] extended [are] officers, directors, or shareholders of the shipper.").

9

that Defendants are referring to the fact that some of the invoices were issued long after the containers were returned to the terminal. (Dkt. No. 58 ¶¶ 112–20.) This argument is without merit. As Laufer explained, the "terminal return date" references the date that the loaded container was delivered to the terminal in Asia, not the date that the empty containers were returned to the terminal in the United States. (Dkt. No. 62 ¶ 19.) Thus, Defendants are incorrect in asserting that the invoices were issued after they were returned to the United States port. And even if they were correct, the Court strains to see how this would create a genuine dispute of material fact, without more.

However, the Court is unable to determine what the parties agreed to with respect to the market and flat rates. The Arrangement states that Defendants may request additional cargo be shipped, "under the same terms and conditions, as [Laufer] may be able, in its sole discretion, to accommodate." Dkt. No. 56, Ex. 4 ¶ 4.) Though Laufer contends that the parties agreed that any cargo volume booked exceeding the six hundred-container requirement would be moved under market rates, it cites only to its corporate designee's declaration for support. (Dkt. No. 56 ¶ 22.) But Defendants' corporate designee states the opposite: that containers could be shipped at market rates only if Laufer obtained written consent from Standard. (Dkt. No. 61 ¶¶ 47–48.) Nor does Laufer's Exhibit 5 clear things up, contrary to what Laufer contends. In fact, the exhibit, which consists of emails between the two parties, suggests that Laufer *was* required to get pre-approval to ship at the market rate. (*See* Dkt. No. 56, Ex. 5.)

The Court therefore concludes that there is a limited question of material fact as to damages and whether any remaining freight invoices should be charged at the market or fixed rate.

## IV.    Conclusion

For the foregoing reasons, Laufer's motion for summary judgment is GRANTED in part and DENIED in part.  The parties are directed to confer and to submit a letter within 21 days after the date of this Opinion and Order addressing proposals for the remaining phase of this case, including (1) proposed dates and estimated length of time for trial, and (2) any proposals for settlement discussions (e.g., mediation or a settlement conference before Magistrate Judge Gorenstein).

The Clerk of Court is respectfully directed to close the motion at Docket Number 54.

SO ORDERED.

Dated:  March 21, 2022
        New York, New York

_____
                                J. PAUL OETKEN
                                United States District Judge